# United States Court of Appeals for the Federal Circuit

---

**LA CROSSE TECHNOLOGY, LTD.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-1370

---

Appeal from the United States Court of International Trade in No. 07-CV-0114, Senior Judge R. Kenton Musgrave.

---

Decided: July 25, 2013

---

WILLIAM RANDOLPH RUCKER, Drinker Biddle & Reath LLP, of Chicago, Illinois, argued for plaintiff-appellant.

AMY M. RUBIN, Trial Attorney, Civil Division, Commercial Litigation Branch, Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BARBARA S. WILLIAMS, Attorney in Charge, International Trade Field Office, of New York. Of counsel on the brief was CHI S. CHOY, Office of Assistant Chief Counsel,

United States Customs and Border Protection, of New York, New York.

———————————

Before NEWMAN, BRYSON, and O'MALLEY, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* BRYSON.

O'MALLEY, *Circuit Judge.*

Plaintiff-Appellant La Crosse Technology, Ltd. ("La Crosse") disputes the Harmonized Tariff Schedule of the United States ("HTSUS") classification of several models of imported electronic devices that measure and display atmospheric and weather conditions. The devices also display the time and date. Upon liquidation, U.S. Customs and Border Protection ("Customs") classified all the subject devices as "other clocks" under HTSUS subheading 9105.91.40. La Crosse challenged Customs' classification, and the United States Court of International Trade reclassified many of the imported devices. The trade court divided the subject devices into three general categories: Weather Station models, Professional models, and Clock models. The trade court classified the Weather Station models under HTSUS subheading 9025.80.10 (which includes thermometers, barometers, hygrometers, and combinations of these instruments), the Professional models under subheading 9015.80.80 (which includes certain "meteorological . . . instruments and appliances"), and the Clock models under subheading 9105.91.40 (which includes certain clocks). On appeal, La Crosse challenges the trade court's classification of a number of devices the court categorized as Weather Station and Clock models. For the reasons below, we find that the models at issue on appeal are properly classified under HTSUS subheading 9015.80.80. Thus, we reverse the judgment of the Court of International Trade with respect

to the models at issue on appeal and order Customs to reliquidate these models in accordance with their classification under subheading 9015.80.80.

## I. BACKGROUND

La Crosse imports electronic devices that measure atmospheric conditions (e.g., outdoor temperature, indoor temperature, and/or humidity) and display the measured information alongside temporal information (e.g., the time and date). All the devices at issue on appeal include wireless instruments that measure outdoor conditions and a base unit containing instruments that measure indoor conditions. The devices also contain an LCD display, a barometer to measure air pressure, and a microprocessor. The microprocessor uses an algorithm to analyze historical barometric measurements to provide a weather forecast. The forecast indicates "whether the weather will improve or deteriorate" and is displayed as a "'tendency' arrow, a series of icons, or an image of a boy ('Oscar outlook') whose clothes indicate which type of weather is predicted."[1]  *La Crosse Tech., Ltd. v. United States*, 826 F. Supp. 2d 1349, 1351–52 (Ct. Int'l Trade 2012).

Customs initially classified all the devices at issue as "other clocks" under 9105.91.40. *See La Crosse*, 826 F. Supp. 2d at 1353. La Crosse challenged Customs' classification in the United States Court of International Trade, arguing that the articles were "more than clocks." *Id.* at

---

[1]  Tendency arrows indicate whether the air pressure is increasing (which indicates that weather is expected to improve or remain good) or decreasing (which indicates that weather is expected to become worse or remain poor). Forecast icons include images of the sun, the sun partially concealed by clouds, and clouds with rain.

1355 (internal quotation marks omitted). According to La Crosse, the devices at issue on appeal were constructed to do far more than indicate the time of day and should have been classified as meteorological appliances under HTSUS Heading 9015 because of their ability to forecast the weather. *Id.* La Crosse contended that the subject merchandise was *prima facie* classifiable under Heading 9015 using General Rule of Interpretation ("GRI") 1, which applies "when an imported article is described in whole by a single classification heading or subheading" of HTSUS. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011). The government, on the other hand, argued that classification pursuant to GRI 1 was inappropriate because the devices at issue were composite goods that were not described by a single HTSUS heading or subheading. *La Crosse*, 826 F. Supp. 2d at 1356. According to the government, classification pursuant to GRI 3(b) was appropriate, and the devices were not properly classified under Heading 9015 using such an analysis. *Id.* The parties filed cross-motions for summary judgment, and the trade court granted-in-part and denied-in-part each of the parties' motions.

The trade court agreed with the government that "GRI 3 applies because the subject merchandise is *prima facie* classifiable under more than one heading." *Id.* The court determined that the devices at issue were composite goods that were properly classified pursuant to GRI 3(b), which bases classification of goods on the "'material or component which gives them their essential character.'" *Id.* at 1356–58 (quoting GRI 3(b)). For the purpose of classifying the goods, the court divided the devices into three general categories: Professional models (which are not at issue on appeal), Weather Station models, and Clock models. *Id.* at 1352. The court then examined the "primary functionality and marketing" of the devices in each category to determine their essential character. *Id.* at 1359.

With respect to the Weather Stations, the court noted that La Crosse marketed the devices as "Wireless Temperature Stations" or "Wireless Weather Stations" and determined that the devices "ha[d] a concentration of weather related features which predominate in number over clock functions." *Id.* at 1360. Concluding that the devices' forecasting ability was "imprecise and lack[ed] the character of meteorological equipment" under Heading 9015, the court classified the Weather Stations as combination instruments under subheading 9025.80.10. *Id.* at 1361.

Regarding the Professional models, the court determined "[t]he essential character . . . is also given by their weather-related functions because they overwhelmingly predominate over the clock functions." *Id.* The Professional models included the features of the Weather Station models, but also contained "wind and rain sensors, as well as the ability to download weather data to a computer for further analysis." *Id.* These additional capabilities, in the court's view, made it appropriate to classify the Professional models as meteorological equipment under subheading 9015.80.80, HTSUS. *Id.*

In classifying the Clock models, the trade court focused on the "numerous and predominant clock-related functions and clock-related marketing." *Id.* The court noted that La Crosse described these models as atomic or projection clocks in marketing materials. *Id.* The trade court also observed that, although the Clock models display weather information (including a forecast), the Clock models "display[ed] time information in larger type size than weather information." *Id.* Consequently, the court determined that the Clock models were properly classified under subheading 9105.91.40. *Id.* at 1362.

La Crosse timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II. ARGUMENTS ON APPEAL

On appeal, La Crosse challenges the Court of International Trade's classification of a number of the Clock and Weather Station models, which the trade court placed under subheadings 9105.91.40 and 9025.80.10, respectively.[2] According to La Crosse, the models at issue on appeal should have been classified pursuant to GRI 1 as "meteorological . . . instruments and appliances" under 9015.80.80, HTSUS. The government, however, contends that the trade court properly classified the models pursuant to GRI 3(b).

## III. LEGAL STANDARDS

"We review the grant of summary judgment by the Court of International Trade without deference." *Camel-Bak*, 649 F.3d at 1364. "The ultimate issue as to whether particular imported merchandise has been classified under an appropriate tariff provision is a question of law subject to *de novo* review." *Marcel Watch Co. v. United States*, 11 F.3d 1054, 1056 (Fed. Cir. 1993). Tariff classification under HTSUS generally involves two steps: "(1) ascertaining the proper meaning of specific terms within the tariff provision and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed." *Id.* The first step presents a question of law, which we review de novo. *Id.* The second step presents a question of fact, which we review for clear error. *Id.* "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" *Timber Prods. Co. v.*

---

[2] The models at issue on appeal are WS-7014, -7042, -7049, -7159, -7211, -7394, -8025, -8035, -8157, -9020, -9025, -9031, -9033, -9043, -9055, -9075, -9096, -9115, -9118, -9119, -9151, -9520, -9600, -9611, and WT-5130, -5432, and -5442.

*United States*, 515 F.3d 1213, 1220 (Fed. Cir. 2008) (quoting *United States v. United States Gypsum Co.*, 33 U.S. 364, 395 (1948)). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings . . . ." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

HTSUS GRIs and Additional U.S. Rules of Interpretation govern the classification of imported merchandise and are applied in numerical order. *Id.*; *see also Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998) ("The first step in analyzing the classification issue is to determine the applicable subheadings, if possible, under GRI 1."). In addition, "a court may refer to the Explanatory Notes of a tariff subheading, which do not constitute controlling legislative history but nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings." *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994).

According to GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." "We apply GRI 1 as a substantive rule of interpretation, such that when an imported article is described in whole by a single classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative." *CamelBak*, 649 F.3d at 1364. HTSUS headings and subheadings that describe an article by a specific name are referred to as *eo nomine* provisions. *Id.* When goods are "in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant," then the goods cannot be classified under an *eo nomine* provision pursuant to GRI 1. *Casio, Inc. v. United States*, 73 F.3d 1095, 1097 (Fed. Cir. 1996) (citation and internal quotation marks omitted).

"When goods are prima facie classifiable under two or more headings or subheadings of HTSUS, we apply GRI 3 to resolve the classification." *CamelBak*, 649 F.3d at 1365. We begin with GRI 3(a), which states:

> The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

"We apply GRI 3(a) when the goods, as a whole, are prima facie classifiable under two or more headings or subheadings to determine which heading provides the most specific description of the goods." *CamelBak*, 649 F.3d at 1365. When classification cannot be resolved under GRI 3(a), we turn to GRI 3(b), which provides for classification of goods as though they consist of the "material or component which gives them their essential character." The essential character analysis varies depending on the type of goods at issue and generally involves consideration of the goods' design, function, and use.

The HTSUS Headings and subheadings relevant to this appeal are as follows:

> 9015    Surveying (including photogrammetrical surveying), hydrographic, oceanographic, hydrological, meteorological or geophysical instruments and appliances, excluding compasses; rangefinders; parts and accessories thereof:
>
> 9015.80    Other instruments and appliances [than rangefinders, theodolites, tachymeters, lev-

els, and photogrammetrical surveying instruments and appliances];

9015.80.80      Other [than optical instruments, appliances, and seismographs]

9025      Hydrometers and similar floating instruments, thermometers, pyrometers, barometers, hygrometers and psychrometers, recording or not, and any combination of these instruments; parts and accessories thereof:

Thermometers and pyrometers, not combined with other instruments:

9025.19      Other [than liquid filled]:

9025.19.80      Other [than pyrometers]

9025.80      Other instruments

9025.80.10      Electrical

9105      Other clocks [than wrist watches, pocket watches and other watches, clocks with watch movements, and instrument panel clocks]:

Wall Clocks:

9105.21      Electrically operated:

9105.21.40      With opto-electronic display only

9105.21.80      Other:

9105.91      Electronically operated:

9105.91.40      With opto-electronic display only

## IV. ANALYSIS

We agree with the government that the devices at issue are properly classified pursuant to GRI 3(b), which

requires examination of the essential character of each model. La Crosse contends that classification pursuant to GRI 1 is appropriate because the models at issue are *prima facie* classifiable as meteorological appliances under Heading 9015. According to La Crosse, Heading 9015—which covers "meteorological . . . instruments and appliances"—describes each device in whole.

La Crosse's argument, however, does not give proper weight to the significant timekeeping functions and features of the devices at issue. All the relevant devices display the time and date, and many others have time alarms with snooze timers. HTSUS Heading 9015 describes, in relevant part, meteorological devices. But nowhere does it mention devices capable of timekeeping. Instead, such devices are described by other HTSUS headings (e.g., 9105, HTSUS). We disagree with La Crosse that the time-related features are incidental to the devices at issue, like a common household appliance with a built-in clock. Instead, the key function of the devices at issue is to measure and display information. A not-insignificant portion of the display of each model is devoted to providing time-related information. Indeed, the timekeeping functionality of the products at issue initially led Customs to classify *all* the devices at issue as clocks. We find that the time-related functions of the devices at issue are "substantially in excess" of the features described in Heading 9015. *Casio*, 73 F.3d at 1098 (citation, quotation, and emphasis omitted). Consequently, Heading 9015 does not describe the products *as a whole*, and classification under GRI 1 is inappropriate.[3]

---

[3] Classification under GRI 3(a) similarly is not appropriate because the goods as a whole are not classifiable under two headings. Instead, the devices are described in part by several HTSUS headings. On appeal, neither party contends that classification under GRI 3(a) would be appropriate.

Because we conduct our analysis under GRI 3(b), we examine the essential character of the devices at issue. Determining the essential character of goods requires a fact-intensive analysis that includes consideration of various factors depending on the type of goods involved. *Home Depot U.S.A., Inc. v. United States*, 491 F.3d 1334, 1336–37 (Fed. Cir. 2007). In this case, the trade court conducted an essential character analysis, and classified a number of the devices at issue as clocks under HTSUS subheading 9105.91.40. *La Crosse*, 826 F. Supp. 2d at 1361–62. The court focused on the fact that La Crosse described these models as clocks in its marketing literature, "[t]he array of time-related features is equal [to] or greater than the weather-related functions," and the fact that the models display weather information in smaller type size than time information. *Id.*

Although we agree that time-related functions are an important aspect of the models the trade court classified as clocks, we conclude that the trade court committed error in determining that the essential character of the Clock models was related to timekeeping. As La Crosse points out, the devices the trade court classified as clocks monitor weather conditions and provide weather forecasts that consumers often use to plan their activities. In addition, these weather-related features add significant cost to the products at issue, making them considerably more expensive than a standard clock. *See CamelBak*, 649 F.3d at 1369 (observing the "higher prices CamelBak charges and consumers pay for the subject articles as compared to conventional backpacks" and determining that products were not properly considered conventional backpacks pursuant to GRI 1). As a consequence, we conclude that it is the Clock models' meteorological capabilities, as opposed to their time-related functions, that provide their essential character.

With respect to the models the trade court classified as combination instruments under subheading 9025.80.10

(i.e., the Weather Station models), the trade court observed that the devices "have a concentration of weather-related features which predominate in number over the clock functions." *La Crosse*, 826 F. Supp. 2d at 1360. Based on the significant weather-related features these models possess, we agree with the trade court that "the essential character of the Weather Stations is given by the weather-related functions." *Id.*

Having determined that the essential character of all the devices at issue on appeal is related to their meteorological (as opposed to time-related) capabilities, we must now determine which HTSUS subheading best describes these goods. There are two competing subheadings relevant to this appeal that describe meteorological devices— 9025.80.10 and 9015.80.80. We examine the scope of each subheading below.

Heading 9025 describes "[h]ydrometers and similar floating instruments, thermometers, pyrometers, barometers, hygrometers and psychrometers, recording or not, and any combination of these instruments." With respect to combinations of instruments, the Explanatory Notes to Heading 9025 provide: "This heading also includes combinations of the instruments referred to above . . . except when the addition of one or more other devices gives the combination the character of equipment or appliances covered by more specific headings (e.g., heading 90.15 as meteorological instruments)." (emphasis omitted).

Heading 9015 describes, in relevant part, "meteorological . . . instruments and appliances." The Explanatory Notes to 9015 state: "It should be noted that this group does not cover thermometers, barometers, hygrometers and psychrometers, nor combinations of such instruments (heading 90.25)." (emphasis omitted).

Headings 9025 and 9015, read together and viewed in light of their respective Explanatory Notes, thus set out mutually exclusive categories of meteorological devices.

Heading 9025 is limited to the instruments it expressly names and combinations of those instruments. Heading 9015, on the other hand, broadly encompasses meteorological instruments and appliances *other than* the instruments and combinations explicitly described in Heading 9025.

In simplest terms, Heading 9105 is not descriptive of the devices at issue on appeal, and Headings 9025 and 9015, while both relevant to such devices, establish mutually exclusive classifications. It is our job to decide which of the two mutually exclusive categories more appropriately encompasses the defining characteristics of these products.

Because all of the devices on appeal have forecasting capabilities, we conclude that they are properly classified under subheading 9015.80.80. The trade court erred in concluding otherwise. The trade court discounted the importance of the devices' forecasting function because they were "imprecise and lack the character of meteorological equipment." *La Crosse*, 826 F. Supp. 2d at 1360. The relevant HTSUS headings and subheadings, however, do not distinguish the various types of meteorological devices based on the precision of the forecasts they provide. The devices' forecasting features shape their classification.

Although the devices include thermometers, barometers, and often hygrometers (to measure humidity), they are not merely combination instruments that fit the description of Heading 9025. The thermometers and barometers described in 9025 are instruments that measure current conditions. Such instruments potentially could record historical measurements as well. By contrast, the ability of the devices at issue on appeal to provide a predictive weather forecast by analyzing barometric readings goes well beyond merely measuring and recording information about existing or past atmospheric

conditions. This forecasting function thus distinguishes the meteorological devices at issue on appeal from the instruments described by Heading 9025.

Forecasting is the defining characteristic of the devices at issue that provides their essential character. Forecasting is featured prominently in the names of many of the devices. *See, e.g.*, JA129 (describing model WS-9055 as a "Wireless Forecast Station"); JA132 (describing model WS-9075 as a "Wireless Forecast/Moon Station"). Forecast information takes up a significant portion of the devices' displays. And, the record indicates that the forecasting feature is a significant driver of consumers' purchasing decisions. *See* JA86 (indicating that a forecasting device significantly outsold a similar device that lacked forecasting capability). Thus, the forecasting feature is central to the devices at issue and takes the devices at issue out of the narrow scope of the instruments described by Heading 9025, and into the broader category of meteorological devices described by Heading 9015, and more specifically by subheading 9015.80.80.

## V. CONCLUSION

For the reasons set out above, we reverse the judgment of the Court of International Trade with respect to the classifications challenged on appeal and order Customs to reliquidate these models in accordance with their classification under subheading 9015.80.80.

**REVERSED**

# United States Court of Appeals
# for the Federal Circuit

---

**LA CROSSE TECHNOLOGY, LTD.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-1370

---

Appeal from the United States Court of International Trade in No. 07-CV-0114, Senior Judge R. Kenton Musgrave.

---

BRYSON, *Circuit Judge,* concurring in part and dissenting in part.

I agree with the majority that this case must be decided under General Rule of Interpretation 3(b), which requires a determination as to the "essential character" of the devices in dispute. I also agree that we must uphold the trial court's conclusion as to the proper classification of the disputed items unless we conclude that the court's findings underlying the classification decision constitute clear error. And I agree with the majority's conclusion that the "weather station" models do not fall under HTSUS heading 9025 as "thermometers, pyrometers, barometers, hygrometers . . . and any combination of these instruments." I therefore concur with the court that

the weather station models must be classified under heading 9015 as "meteorological instruments and appliances."

I disagree with the majority on one issue, however. As to the so-called "clock" models, i.e., models WS-8157, WT-5130, WT-5432, and WT-5442, I would uphold the trial court's conclusion that those devices should be classified under HTSUS heading 9105 as "other clocks," because the trial court permissibly found that the essential character of those models is that of electrically operated alarm clocks.

The trial court based its finding as to the essential character of the clock models on what the court called the "numerous and predominant clock-related functions and clock-related marketing." The court noted that those models are sold by La Crosse in its catalog and website as either "Atomic" or "Projection" "clocks." In its advertising, La Crosse refers to both the clock functions and the weather forecasting functions of the devices, but it features the clock functions more prominently, referring to those models variously as "Projection Alarm Clock," "Projection Alarm Clock Atomic Precision," "Wireless Atomic Projection Alarm," "Projection Alarm Clock with Forecast," "Projection Alarm Clock with Oscar Outlook Forecaster," and "Atomic Digital Wall Clock with Forecast & Weather." La Crosse's marketing materials are important evidence of the items' essential character. *See The Pillsbury Co. v. United States,* 431 F.3d 1377, 1380 (Fed. Cir. 2005).

The time of day is the most prominent feature on each of the clock models, with the outdoor temperature and some indication of the forecast (based on an internal barometer) occupying a less prominent place in the device's display panel. Most of the clocks project the time and temperature on the wall in large numbers. Each of the clocks also has other time-related functions, such as a

time alarm with a snooze control, a perpetual calendar, time zone setting, and automatic updates for Daylight Savings Time.

Based on all that evidence, the trial court found that the forecasting function of the clocks was subsidiary to the clock functions and was insufficient to give the devices the "essential character" of meteorological equipment. To the contrary, the court found, the clock features and the "layout of the displays and marketing information" demonstrated "that the essential character of the Clocks is given by the clock component."

Under General Rule of Interpretation 3(b), the trial court had only two choices with respect to the clock models: The "essential character" of the clock models was either as clocks that also had a weather forecasting function, or as weather forecasting devices that also had a clock function. The trial court concluded that the first category fit the "clock" models better than the second.

That is a quintessentially factual determination. I can see no justification for overriding the trial court's factual finding on that issue and substituting this court's judgment that the essential character of those four models is as weather-predicting instruments. It is doubtless true that each of the clock models is more expensive than it would be without the weather-related features. That would also be true, however, if each of the clocks had a daily updated listing of baseball scores or Dow Jones, Nasdaq, and S&P 500 averages at the bottom of the clock. Yet the inclusion of such a feature would not alter the "essential character" of the device from that of a clock to that of a sporting results monitor or a securities exchange reporting device. Because I do not believe the trial court committed clear error in its conclusion as to the "essential character" of the clock models, I respectfully dissent from this court's ruling as to those four models.